UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ALICIA LEAKE, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> ALEX GENERAL CONSTRUCTION, LLC, *et al.*, <br><br> Defendants. | Civil Action No. 23-3465 (JEB) |

**MEMORANDUM OPINION**

    This is the latest installment in a home-improvement tale gone awry. More than three years ago, Plaintiffs Alicia and Sean Leake hired Alex General Construction, LLC to renovate their Washington, D.C., home. According to Plaintiffs, the result was a nightmare. In their telling, AGC blew through multiple deadlines, all the while performing shoddy — and in places dangerous — work. Pushed past their breaking point, the Leakes terminated the contract and sued AGC. The company moved to dismiss the suit, which motion this Court denied last fall. See ECF No. 34 (Mot. to Dismiss Op.). The Leakes then amended their Complaint in order to add Bayron Alex Salguero as a Defendant. See ECF No. 48 (Second Am. Compl.). They allege that Salguero is the sole owner of AGC and was the person who both misled them and decided to cut corners on the project. They therefore seek to hold him personally liable on each of their nine claims. See id., ¶¶ 187–353. In response, he now moves to dismiss, principally claiming that Plaintiffs cannot pierce the corporate veil to reach him personally. See ECF No. 49 (Mot.) at 5–6. The Court disagrees, concluding that the Leakes have adequately pled that he can be held

1

liable as both a shareholder and an officer of AGC.  While their allegations establishing personal liability are not overwhelming, the claims against Salguero can proceed.

**I.     Background**

As it must on this posture, the Court considers the facts alleged in the Second Amended Complaint as true.  See Sparrow v. United Air Lines, Inc., 216 F.3d 1111, 1113–14 (D.C. Cir. 2000).

In the fall of 2021, the Leakes consulted with AGC — represented at all times by Salguero — about renovating their home.  See Second Am. Compl., ¶ 11.  Salguero did a walk-through and told them that AGC could complete the project for $50,000 in a three-month span.  Id., ¶¶ 12–13.  In December, the Leakes entered into two written agreements with AGC; Salguero signed both on behalf of the LLC.  Id., ¶¶ 14–19.  The agreements specified that AGC would, in addition to other smaller tasks, create a laundry room, renovate the kitchen and install new appliances, demolish several walls, open a stairwell, and paint the whole house.  Id., ¶ 18.  The agreements further provided that AGC would hire an architect "to make a plan" for these renovations.  Id.  Upon signing the agreements, the Leakes handed Salguero a check for $10,000.  Id.

Things soon went haywire, according to the Leakes.  Although the agreements stipulated that the project would be finished by April 2022, AGC received four extensions, each requested orally by Salguero.  Id., ¶¶ 120, 124–26.  In the final extension request, Salguero assured the Leakes that all work would be completed by August 20 — the date that they had told him they needed to move back into their home.  Id., ¶¶ 124–25.  When the project was not finished by then, the Leakes terminated their agreements with AGC.  Id., ¶ 127.  They were left with a trashed and uninhabitable abode: uncovered electrical sockets and loose wiring, holes in the

walls, faulty plumbing, mold, paint splatter, and even standing urine in a toilet that was not part of the renovation. Id., ¶¶ 16, 51, 55, 62–65, 128–29. By the time they terminated the contract, the Leakes had paid AGC $39,000. Id., ¶ 117. They thereafter spent some $100,000 more correcting the half-completed renovations. Id., ¶¶ 117, 274. All told, they were unable to live in their home for 15 months, paying for rent and storage costs throughout that time. Id.

Plaintiffs sued AGC in D.C. Superior Court, claiming breach of contract and seeking damages. See ECF No. 1-2 at ECF p. 2 (Compl.). After Plaintiffs amended their Complaint to include additional damages claims, AGC removed this action to federal court on the basis of diversity jurisdiction. See ECF No. 11 (Removal Op.). Last fall, AGC moved to partially dismiss the case, but this Court rejected the company's motion. See Mot. to Dismiss Op. at 1, 4–11. Plaintiffs then sought leave to amend their Complaint a second time in order to add Salguero as a Defendant; the Court granted that request in January of this year. See ECF No. 47 (Second Am. Compl. Order). The Second Amended Complaint brings nine claims against both AGC and Salguero: (I) failure to comply with D.C. licensing requirements; (II) failure to comply with a D.C. statute requiring sellers to inform buyers of their right to cancel certain agreements; (III) breach of contract; (IV) violation of the D.C. Consumer Protection Procedures Act; (V) breach of the implied covenant of good faith and fair dealing; (VI) breach of warranty; (VII) negligence; (VIII) fraud; and (IX) unjust enrichment. See Second Am. Compl., ¶¶ 187–353. Salguero now seeks dismissal, arguing that Plaintiffs cannot hold him personally liable for any of these claims. See ECF No. 49 (Mot.).

**II.    Legal Standards**

Salguero's Motion to Dismiss invokes Federal Rule of Civil Procedure 12(b)(6). In evaluating such motions, courts must "treat the complaint's factual allegations as true . . . and

must grant plaintiff the benefit of all inferences that can be derived from the facts alleged." Sparrow, 216 F.3d at 1113 (quotation marks omitted). Although "detailed factual allegations" are not necessary to withstand a Rule 12(b)(6) motion, Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Twombly, 550 U.S. at 570). That is, the facts alleged in the complaint "must be enough to raise a right to relief above the speculative level." Twombly, 550 U.S. at 555. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are therefore insufficient to withstand a motion to dismiss. Iqbal, 556 U.S. at 678.

The court need not accept as true "a legal conclusion couched as a factual allegation," Trudeau v. FTC, 456 F.3d 178, 193 (D.C. Cir. 2006) (quoting Papasan v. Allain, 478 U.S. 265, 286 (1986)), nor "inferences . . . unsupported by the facts set out in the complaint." Id. (quoting Kowal v. MCI Commc'ns Corp., 16 F.3d 1271, 1276 (D.C. Cir. 1994)). And it may consider not only "the facts alleged in the complaint" but also "matters of which [courts] may take judicial notice." Equal Emp. Opportunity Comm'n v. St. Francis Xavier Parochial Sch., 117 F.3d 621, 624 (D.C. Cir. 1997).

### III.    Analysis

Although they are muddled in the parties' briefing, Salguero's Motion to Dismiss raises three distinct questions relating to whether he can be held personally liable: (a) can any claims proceed against him as a shareholder of AGC; (b) can the tort claims proceed against him as an officer of AGC; and (c) can the D.C. Consumer Protection Procedures Act (CPPA) claims proceed directly against him? Although the first is a closer question than the others, the Court answers each in the affirmative.

A. Shareholder Liability (Veil Piercing)

It is a "basic tenet of American corporate law . . . that the corporation and its shareholders are distinct entities." Dole Food Co. v. Patrickson, 538 U.S. 468, 474 (2003). In certain circumstances, however, the "veil separating corporations and their shareholders may be pierced," id. at 475, allowing "the shareholder [to be] held liable for the corporation's conduct." United States v. Bestfoods, 524 U.S. 51, 62 (1998). Salguero, who is allegedly AGC's sole beneficial owner, see Second Am. Compl., ¶ 4, objects that Plaintiffs have fallen short of demonstrating that this is such a circumstance.

Before analyzing whether the corporate veil can be pierced here, the Court must first determine whether D.C. or Maryland law governs that analysis — an issue entirely unaddressed by the parties, both of whom assume that D.C. law applies. While the central events in this case (i.e., the contract negotiations and home-renovation work) took place in the District, AGC and Salguero are associated with Maryland addresses. See Second Am. Compl., ¶¶ 2–4. Indeed, Salguero attaches paperwork to his Motion listing a Maryland address for AGC, albeit one that is different from that offered by Plaintiffs. See ECF No. 49-1 (Exh. 1) at 1. The Court can at this juncture take judicial notice of this confirmatory evidence that AGC is registered in Maryland, as the exact address within Maryland is not relevant to the choice-of-law analysis. See Spence v. U.S. Dep't of Veterans Affs., 109 F.4th 531, 539 n.2 (D.C. Cir. 2024) (courts may "take judicial notice only of a fact that is not subject to reasonable dispute") (quotation marks omitted).

In a diversity-jurisdiction case, a court typically "applies the choice of law rules of the forum state (or district or territory)," Nationwide Mut. Ins. Co. v. Richardson, 270 F.3d 948, 953 (D.C. Cir. 2001) (quotation marks omitted), and that remains true for veil-piercing cases. TAC–Critical Sys., Inc. v. Integrated Facility Sys., Inc., 808 F. Supp. 2d 60, 64–65 (D.D.C. 2011)

(rejecting contrary view); accord B & H Nat. Place, Inc. v. Beresford, 850 F. Supp. 2d 251, 260 (D.D.C. 2012). The Court must therefore apply the District of Columbia's choice-of-law rules to determine whether its veil-piercing laws or those of Maryland control. See TAC-Critical, 808 F. Supp. 2d at 65.

Those rules require that a court "evaluate the governmental policies underlying the conflicting laws and determine which jurisdiction's policies would be most advanced by having its law applied to the facts of the case under review." Id. (cleaned up) (quoting Hartley v. Dombrowski, 744 F. Supp. 2d 328, 336 (D.D.C. 2010)). When applying that test in a contract case such as this, a court considers the place(s) where the contracting, contract negotiation, and contract performance occurred as well as the location of the parties' incorporation and place of business. Id. (citing Turkmani v. Republic of Bolivia, 273 F. Supp. 2d 45, 51 (D.D.C. 2002)). In light of those factors, D.C. law applies. Not only was the contract negotiated and signed in the District, but it is where the performance — and alleged breach — occurred. And the jurisdiction "where the defendant's alleged conduct occurred has the dominant interest in regulating it." TAC-Critical, 808 F. Supp. 2d at 66 (quoting Bledsoe v. Crowley, 849 F.2d 639, 643 (D.C. Cir. 1988)) (cleaned up).

With that foundation laid, we turn to the question of whether under D.C. law Salguero can be held liable as a shareholder of AGC. The Leakes allege that he is the "alter ego" the entity. See Second Am. Compl., ¶¶ 4, 5, 78, 213, 318. Such a theory holds (in the reverse of Plaintiffs' formulation) that in certain circumstances a corporate entity is merely the "business conduit" of a single person. See 1 William Meade Fletcher *et al*., Fletcher Cyclopedia of the Law of Corporations, § 41.10 (Perm. ed., Sept. 2024 Update); Labadie Coal Co. v. Black, 672 F.2d 92, 97 (D.C. Cir. 1982). When it applies, the theory permits "cast[ing] aside the corporate

6

shield and fasten[ing] liability on the individual shareholder." Est. of Raleigh v. Mitchell, 947 A.2d 464, 470 (D.C. 2008) (quoting precursor version of Fletcher, *supra*, § 41.35). Alter-ego liability arises when — in addition to factors to be described shortly — "substantial ownership" of a corporate entity "is concentrated in one person or a few persons." Id. An allegation resting on the alter-ego theory, moreover, "is not in itself a claim for substantive relief." Fletcher, *supra*, § 41.10. Rather, it is an attempt to extend liability on an underlying claim, thereby reaching an "individual upon a cause of action that otherwise would have existed only against the . . . corporation." Id.; see TAC-Critical, 808 F. Supp. 2d at 66.

      Pursuing the alter-ego theory, as just noted, involves piercing the corporate veil. Est. of Raleigh, 947 A.2d at 470. In the District, a party is permitted to do so "upon proof that there is (1) unity of ownership and interest, and (2) use of the corporate form to perpetrate fraud or wrong, or other considerations of justice and equity justify it." Id. (quotation marks omitted); see Bingham v. Goldberg. Marchesano. Kohlman. Inc., 637 A.2d 81, 93 (D.C. 1994). To determine whether these two elements have been met, courts "consider a range of factors, including whether corporate formalities have been observed; whether there has been any commingling of corporate and shareholder funds, staff, and property; whether a single shareholder dominates the corporation; [and] whether the corporation is adequately capitalized." Meshel v. Ohev Sholom Talmud Torah, 869 A.2d 343, 355 (D.C. 2005); see Est. of Raleigh, 947 A.2d at 470–71; Bingham, 637 A.2d at 93; Vuitch v. Furr, 482 A.2d 811, 816 (D.C. 1984). The "factor which predominates will vary in each case," and there is no "uniform standard to determine whether the evidence has sufficiently demonstrated unity of interest and ownership." Vuitch, 482 A.2d at 816. "Because piercing the corporate veil is a doctrine of equity," deciding whether to do so is necessarily "influenced by considerations of who should bear the risk of loss and what degree of

legitimacy exists for those claiming the limited liability protection of a corporation." Id. at 815–16; see United States v. Andrews, 146 F.3d 933, 940 (D.C. Cir. 1998) ("The ultimate principle [of veil piercing] is one permitting its use to avoid injustice.").

Despite the prolixity of Plaintiffs' Second Amended Complaint, and although they amended it specifically to add Salguero as a Defendant, the allegations supporting their alter-ego theory are rather thin — and in places inconsistent. Even so, accepting the Complaint's factual assertions as true and granting Plaintiffs the benefit of all inferences that can reasonably be drawn from those facts, see Hettinga v. United States, 677 F.3d 471, 476 (D.C. Cir. 2012), the Court concludes that they have met their burden — if only barely.

Start with the first prong. Unity of ownership and interest can "be demonstrated by showing domination and control of a corporation," including "in a closely held corporation." Vuitch, 482 A.2d at 816. Plaintiffs allege several facts to show that Salguero completely dominated and controlled AGC. He is the sole beneficial owner of the company and "at every stage" was the only person "acting on AGC's behalf." Second Am. Compl., ¶¶ 4–5. He endorsed each check that Plaintiffs provided to AGC, id., ¶ 4, and throughout the monthslong renovation process was the sole face of — and their sole point of contact with — AGC. See, e.g., id., ¶¶ 15, 37, 39, 52–53, 77. Although not extensive, these allegations are sufficient: when one person "alone holds the reins of [a corporate entity's] activities," and it is "by his actions alone that a relationship with [a] plaintiff was established and business transacted," then "there is an increased justification . . . to disregard the corporate entity." Labadie, 672 F.2d at 97 (applying federal common law); Camacho v. 1440 Rhode Island Ave. Corp., 620 A.2d 242 n.22 (D.C. 1993) (citing Labadie for veil-piercing law); Lawlor v. Dist. of Columbia, 758 A.2d 964,

975 (D.C. 2000) (same). It is reasonable, in other words, to infer that AGC was merely the "business conduit" of one person — Salguero. Labadie, 672 F.2d at 97.

Plaintiffs attempt to reinforce that conclusion by alleging that AGC and Salguero share the same address. Were that true, it could be a weight-bearing allegation. In closely held corporations, commingling assets or treating corporate assets as one's own can support an alter-ego theory. See Fletcher, *supra*, §§ 41.50, 41.72. Except the Complaint is inconsistent on this point: in one part, the Leakes allege that the "address of AGC and [Salguero's] home address is the same," Second Am. Compl., ¶ 214; see Opp. at 11, but in an earlier section of the Complaint, they provide different street addresses for AGC's "principal place of business" and Salguero's residence. See Second Am. Compl., ¶¶ 3–4. The Court therefore cannot conclude that this allegation supports piercing the veil.

Plaintiffs muster a relatively stronger case on the second prong, which asks whether recognizing corporate separateness would "sanction a fraud or promote injustice." Vuitch, 482 A.2d at 815 (quotation marks omitted). They first allege that Salguero used the existence of AGC to mislead them. As they tell it, he consistently "misrepresented his status and authority" *vis-à-vis* AGC. See Opp. at 10. When executing the agreement, instead of signing on the line provided for the contractor (here, AGC), he signed beneath it. See Second Am. Compl., ¶ 144. In doing so, they say, he meant to conceal the fact that he was the contractor — *i.e.*, the company's owner. Id., ¶¶ 144, 254. Later, when parrying their complaints, he "routinely" told them he had a "boss," thereby implying that he was a mere employee of the company that he in fact owned. See id., ¶¶ 77–78, 144, 254; Opp. at 10. Although Plaintiffs could have better spelled it out, these allegations arguably indicate that Salguero hid behind his LLC in order to

9

obscure, misdirect, and delay, thereby using "the corporate form to perpetrate" the alleged "wrong[s]." Est. of Raleigh, 947 A.2d at 470 (quoting Bingham, 637 A.2d at 92).

More important is the allegation that AGC was undercapitalized. While inadequate capitalization can also be relevant to the first prong, see Fletcher, *supra*, § 41.33 (noting it can "be a major consideration in deciding whether a legitimate separate corporate entity was maintained"), an entity's "insolvency or undercapitalization is often an important" means of demonstrating that "use of the corporate form [would] promote injustice or wrong." Vuitch, 482 A.2d at 819. That is, it is an abuse of the corporate form for an entity to be so chronically undercapitalized that it is unable to satisfy its debts or a judgment against it. See id.; Fletcher, *supra*, § 41.33. As evidence that AGC was fatally undercapitalized, the Leakes allege that Salguero used the money they paid him to fund other projects. See Second Am. Compl., ¶ 319. Specifically, they claim that he demanded an additional $10,000 payment in order to complete the kitchen even though they had already paid for that portion of the project, and that he did so in order to finance other clients' renovations. Id., ¶ 338. Salguero does not dispute that — if true — such fact demonstrates an inadequate level of capitalization for a home-renovation company. See Labadie, 672 F.2d at 99 ("Whether capitalization is adequate is . . . a function of the type of business in which the corporation engages."); Francis O. Day Co. v. Shapiro, 267 F.2d 669, 673 (D.C. Cir. 1959) (same). AGC's alleged undercapitalization and Salguero's reliance on the entity to perpetrate the alleged wrongs thus together satisfy the second prong of the veil-piercing test.

Although perhaps not finely crafted, the Second Amended Complaint adequately alleges that AGC "is not only controlled by [Salguero], but also that the separateness of [Salguero] and the corporation has ceased and an adherence to the fiction of the separate existence of the

corporation would sanction a fraud or promote injustice." Camacho, 620 A.2d at 249 (cleaned up). So, at least for now, the Leakes' claims can proceed directly against Salguero *qua* shareholder of AGC. At summary judgment or trial, he remains free to dislodge that conclusion with evidence of his own.

### B. Officer Liability

Salguero also appears to object that none of the Leakes' tort claims can proceed directly against him based upon his conduct while acting as an officer of AGC. He contends that he can be held liable only for tortious conduct taken "in a personal capacity outside the scope of his role as AGC's owner and agent," but not for any "any misrepresentations" or "wrongful conduct" he undertook when acting as an officer of the company. See Mot. at 6–7; ECF No. 51 (Reply) at 5. He is mistaken.

As an initial matter, Salguero overlooks that "the legal principles governing the liability of corporate officers for their own tortious acts differ from those applicable to shareholder liability in veil-piercing cases." Lawlor, 758 A.2d at 974; see Reply at 4–5. Under D.C. law, "corporate officers are not shielded by the limited liability of the corporation for liability for their own tortious acts. They are individually liable for the torts which they commit, participate in, or inspire, even though the acts are performed in the name of the corporation." Camacho, 620 A.2d at 246 (quotation marks omitted). "Sufficient participation can exist when there is an act or omission by the officer which logically leads to the inference that he had a share in the wrongful acts of the corporation which constitute the offense." Lawlor, 758 A.2d at 975 (quotation marks omitted).

The Leakes amply allege that Salguero committed torts or participated in those of AGC. They claim that he was the person who deceived them, defrauded them, and decided that AGC

11

would do inferior or unsafe work. They allege, for instance, that he was the one who misled them during the contract formation, id., ¶¶ 13, 15, 205, 207, 321–25; decided to hire unlicensed subcontractors and workers, id., ¶¶ 45, 193, 223, 225, 273, 283, 293; illegally obtained an electrical license in the name of another person, id., ¶¶ 42–46, 88, 95–98, 331–33; fraudulently demanded and accepted installment payments, id., ¶ 319; knew that he "had neither the expertise nor man power to complete the project" on time, id., ¶ 258; misrepresented the reasons for the project delays, id., ¶ 244; and refused to refund the $39,000 already paid by the Leakes. Id., ¶¶ 257, 350, 353. Rather than a mere "share in the wrongful acts" of AGC, in other words, he "dominated [the] decision-making" that led to them. Lawlor, 758 A.2d at 972, 975 (emphasis added). Indeed, here as elsewhere, the dominating "conduct" that permits "impos[ing] personal liability on [Salguero] as a corporate shareholder also warrant[s] imposition of liability as a corporate officer": he "used his authority to engineer the actions" that give rise to this suit. Id. at 976; see McWilliams Ballard, Inc. v. Broadway Mgmt. Co., 636 F. Supp. 2d 1, 10 (D.D.C. 2009).

The Leakes therefore adequately allege that Salguero is personally liable for torts he committed or participated in when acting in his capacity as an officer of AGC. That they were "performed in the name of the corporation will not absolve [him] from liability." Lawlor, 758 A.2d at 976 (quotation marks omitted).

    C. <u>D.C. Consumer Protection Procedures Act</u>

Finally, Salguero argues that he cannot be held personally liable under the CPPA. This contention can be dealt with swiftly. Seeking to resurrect and refurbish the argument just leveled, he claims that he can be held liable under the CPPA only for acts taken in his individual capacity "independent of AGC's business activities," not those he performed as owner or officer

12

of AGC.  See Mot. at 7; see also Reply at 6.  But the sole case he cites as support — Hume v. Watson, 680 F. Supp. 2d 48 (D.D.C. 2010); see Reply at 6 — stands for essentially the opposite proposition.

In Hume, a plaintiff brought one of the same claims as the Leakes.  See 680 F. Supp. 2d at 50 (claiming violation of D.C. Code § 28-3904(dd)); Second Am. Compl., ¶¶ 231, 239–40 (same).  Such a claim lies if there was a home-improvement contract for a residential property for at least $300; if, "under the contract, defendants required or accepted payment in advance of the full completion of all work required to be performed under the contract"; and if the "defendants were not licensed in the District of Columbia as home improvement contractors." Hume, 680 F. Supp. 2d at 50 (cleaned up); see D.C. Code § 28-3904(dd); 16 DCMR §§ 800.1, 899.1.  The defendant in Hume was an individual who, on behalf of his employer (a company), contracted with the plaintiff and accepted payment for the home-improvement work even though neither he nor the company held the proper licenses.  See 680 F. Supp. 2d at 49.  He objected that even if the company were liable, he was not individually so.  Id. at 51.  The court rejected that contention, observing that the D.C. regulation undergirding the claim provides that "[n]o person shall require or accept any payment for a home improvement contract."  Id. (cleaned up) (quoting 16 DCMR § 800.1).

This Court therefore sees nothing in Hume to suggest that Salguero is across-the-board not liable under the CPPA for his actions if they were on behalf of AGC or part of its business activities.  Indeed, here, as in Hume, Plaintiffs allege that Salguero was the person who engaged in the contract formation and requested payments in violation of the CPPA.  See Second Am. Compl., ¶¶ 237, 239.  As a result, contrary to what he appears to argue, see Mot. at 6, he can be

13

liable for certain CPPA claims even if he only misrepresented AGC's licensure as opposed to his own.

## IV. Conclusion

For the foregoing reasons, the Court will deny Salguero's Motion to Dismiss. A separate Order so stating will issue this day.

/s/ *James E. Boasberg*
JAMES E. BOASBERG
Chief Judge

Date: May 8, 2025